IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:14-CV-73-BO

WILLIE R. ETHERIDGE SEAFOOD CO., )
*et al.*, )
)
Plaintiffs, )
)
v. ) ORDER
)
THE HONORABLE PENNY PRITZKER, )
SECRETARY OF COMMERCE, and )
DR. KATHRYN SULLIVAN, )
ADMINISTRATOR OF THE NATIONAL )
OCEANIC AND ATMOSPHERIC )
ADMINISTRATION, )
)
Defendants. )

This cause comes before the Court on cross-motions for summary judgment. The motions have been fully briefed and are ripe for adjudication. For the reasons discussed below, plaintiffs' motion is denied and defendants' motion is granted.

## BACKGROUND

Plaintiffs are eighteen pelagic longline fishermen or fishing companies operating out of Wanchese, Hatteras, Manteo, and Nags Head, North Carolina as well as New York and Florida. Plaintiffs filed this action on December 30, 2014, to challenge the regulations implementing Amendment 7 to the 2006 Consolidated Atlantic Migratory Species Fishery Management Plan, which was published as a Final Rule on December 2, 2014. 79 Fed. Reg. 71,510 (December 2, 2014); AR003414 [A152].[1]

---

[1] Citations to the administrative record (AR) are noted first using the AR page and second in brackets using the corresponding exhibit number as presented to the Court on DVD.

Atlantic highly migratory species (HMS), such as tuna, swordfish, and shark, are managed under both the Magnuson-Stevens Fishery and Conservation Management Act (M-SA), 16 U.S.C. §§ 1801 *et seq.*, and the Atlantic Tunas Convention Act (ATCA). 16 U.S.C. §§ 971 *et seq.*; *see also* AR002317 [A124]. The Secretary of Commerce (Secretary) is responsible for management of Atlantic HMS and she must prepare a fishery management plan (FMP) for stocks in need of conservation and management. 16 U.S.C. §§ 1852(a)(3); 1853(a)(1)(A). The M-SA requires the Secretary, acting through the National Marine Fisheries Service (NMFS), to rebuild overfished fisheries and prevent overfishing in order to maintain the optimum yield for particular species. AR002317 [A124]. In so doing, NMFS must act consistently with ten National Standards. 16 U.S.C. § 1851(a)(1)-(10). The ATCA authorizes NMFS to promulgate regulations which carry out the binding recommendations of the International Commission for the Conservation of Atlantic Tunas (ICCAT). Conservation of Atlantic Tunas, *ratified by the U.S.* April 24, 1967, 20 U.S.T. 2887; T.I.A.S. No. 6767.

Atlantic bluefin tuna (bluefin tuna or bluefin) are a highly migratory pelagic species whose migration patterns range across the North Atlantic to the Mediterranean. AR007105 [K5]. As is relevant here, bluefin tuna habitats are found in the Gulf of Mexico, off the Mideast coast of Florida, off the coast of North Carolina, and from Connecticut to Maine. AR007108 [K5]. The maximum lifespan for bluefin tuna is approximately forty years, with an average twenty year old bluefin weighing 400kg (roughly 880lbs) and spanning 300cm (roughly 9.8ft) in length. AR007107 [K5]. Bluefin tuna are the largest of the tuna species and grow more slowly than other tuna species. AR002429-30 [A124]. Most U.S. bluefin tuna is exported to Japan, with 2012 export of both Atlantic and Pacific bluefin reaching 511mt[2] valued at $4.91 million.

---

[2] Metric tons

AR002539 [A124]. U.S. consumption of domestic bluefin generally ranges between 100mt and 200mt per year. AR002540 [A124].

Pelagic longlines (PLL) are fishing lines suspended just below the surface of the water, with multiple smaller lines supplied with baited hooks branching off. *See* 50C.F.R. § 635.2; AR002453-54 [A124]. While PLLs may be modified to attract a particular species, "it is generally a multi-species fishery." AR002454 [A124]. In the United States, bluefin tuna may be targeted with purse seines and handgear, such as rod-and-reel and harpoon. AR007126 [K5]. PLLs also catch bluefin tuna, but such gear is not permitted to target bluefin; pelagic longline vessels are permitted to retain a limited amount of incidental bluefin bycatch while they are targeting other species such as yellowfin tuna and swordfish. *Id.*

Atlantic bluefin tuna became a quota managed species when it was identified as overfished by the Secretary in 1997, which triggered the necessity of a rebuilding program. *Nat'l. Audubon Soc. v. Evans*, CIV.A. 99-1707 (RWR), 2003 WL 23147552, at *1 (D.D.C. July 3, 2003); 64 Fed. Reg. 29,090 (May 28, 1999). NMFS implements ICCAT's recommended bluefin quota for the United States through its rulemaking. AR003416 [A152]. The 1999 Atlantic Tunas, Swordfish, and Sharks FMP (1999 Atlantic Tunas FMP) allocated the United States' share of ICCAT bluefin quota among seven categories: general, angling, harpoon, purse seine, longline, trap, and reserve. 64 Fed. Reg. 29,149 (May 28, 1999). In 2006, NMFS combined the 1999 Atlantic Tunas FMP with the Atlantic Billfish FMP in the 2006 Consolidated HMS FMP. 71 Fed. Reg. 58,058 (October 2, 2006). The 2006 Consolidated HMS FMP allocated the bluefin tuna baseline annual landings quota of 1,464.6mt among the six active categories, leaving 2.5% in reserve for seasonal and annual adjustments. *Id.* at 58,170. The PLL category was allocated 8.1% or 118.6mt of bluefin quota.

3

Historically, ICCAT recommendations permitted dead discards – fish which are caught but discarded for regulatory or economic reasons, 16 U.S.C. § 1802( 9), (38) – to be counted under a separate quota allowance. AR002283 [A124]. In 2006, ICCAT changed its recommendation regarding dead discards, requiring each country to account for dead discards within their annual quota allocations. *Id.* After this change, the PLL category bluefin catches (landings plus dead discards) were consistently over their subquota, but NMFS was able to "rely on underharvest and annual quota adjustments from the reserve category to cover [PLL] operations while ensuring that the United States remain[ed] within its annual U.S. bluefin quota." AR002284 [A124].

In subsequent years, ICCAT made additional changes which decreased the percentage of underharvest that could be carried forward each year and decreased the total allowable bluefin catch for contracting parties. *See* AR000533;539 [A40]. Further, since 2006, bluefin tuna landings have been increasing, with the PLL category reaching its adjusted quota resulting in closure of some areas in as early as May and June of 2012 and 2013. AR000548 [A41]; AR002725-26 [A124]. In 2014, NMFS noted that

> Annual implementation of the existing domestic allocation quota system has become more difficult in recent years due to a change in the way dead discards are calculated which increased the estimate of bluefin dead discards, a larger percentage of the adjusted quota being landed within the directed fisheries, and lastly, changes in ICCAT requirements regarding accounting for dead discards and allowable carryforward of unused quota.

AR002319 [A124]. NMFS thus undertook the drafting of Amendment 7 to the 2006 Consolidated HMS FMP in order to account for these difficulties. The stated purpose of Amendment 7 is "to ensure sustainable management of bluefin tuna consistent with the 2006 HMS FMP and address ongoing management challenges in the Atlantic bluefin tuna fisheries." 79 Fed. Reg. 71,510 (December 2, 2014); AR003415 [A152].

4

Through Amendment 7, NMFS has implemented the following changes which directly affect the PLL fleet: reallocation of U.S. bluefin tuna quota among the seven categories, imposition of individual bluefin quotas (IBQs) and two new gear restricted areas (GRAs), closure of the PLL fishery when annual bluefin tuna quota is reached, and expansion of monitoring requirements, including electronic monitoring via cameras and bluefin tuna catch reporting via Vessel Monitoring Systems (VMS). Amendment 7 makes additional changes including changes to the target catch requirements in the PLL fishery, retention requirements for legal-sized bluefin tuna, as well as VMS requirements for the purse seine category, change in season start date for the purse seine category, and requirements for general and harpoon categories to use automated catch reporting. 79 Fed. Reg. 71,510; AR003415 [A152].

Plaintiffs allege that Amendment 7 threatens the economic viability of their businesses by imposing onerous monitoring requirements and bycatch quotas. Plaintiffs contend that with the new restrictions imposed by Amendment 7 the overall swordfish yield in the fishery will be lower while the cost of compliance will reduce profitability such that many vessels will be unable to continue to fish. Plaintiffs further contend that Amendment 7's IBQ Program gives preferential treatment to two groups, is neither fair nor equitable, and disenfranchises longtime fishermen who have borne the largest brunt of conservation efforts. Plaintiffs seek vacatur in whole or in part of the provisions implementing Amendment 7.

## DISCUSSION

STANDARD OF REVIEW

Plaintiffs and defendants have moved for summary judgment. A motion for summary judgment may not be granted unless there are no genuine issues of material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Review of the agency's

5

regulations implementing an HMS FMP is conducted under the same standard as that provided by the Administrative Procedures Act. 5 U.S.C. § 706(a)(2); 16 U.S.C. § 1855(f). "A regulation implementing a FMP will be upheld . . . unless the Secretary has acted in an arbitrary and capricious manner promulgating such regulations." *Oregon Trollers Ass'n v. Gutierrez*, 452 F.3d 1104, 1119 (9th Cir. 2006) (internal quotation and citation omitted). In other words, an FMP regulation must be upheld so long as there is a rational basis for it. *Id.* A regulation will be determined to be rational if it "responds to significant points raised during the public comment period" and the agency has considered "significant alternatives to the course it ultimately chooses." *Allied Loc. and Regl. Mfrs. Caucus v. U.S. E.P.A.*, 215 F.3d 61, 80 (D.C. Cir. 2000).

"Courts must conduct a 'searching and careful' inquiry into the agency decision, although this review is ultimately a 'narrow' one." *J.H. Miles & Co., Inc. v. Brown*, 910 F. Supp. 1138, 1146 (E.D. Va. 1995) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). This Court is limited in its review to the administrative record, and it must decide "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Engr. Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985).

In their complaint, plaintiffs allege that provisions of Amendment 7 fail to comply with the National Standards for fishery conservation and management, 16 U.S.C. § 1851(a), and other requirements of the Magnuson-Stevens Act. Plaintiffs do not dispute the NMFS's conservation efforts, but rather attack the methods NMFS has chosen to meet its conservation goals. In their motion for summary judgment, plaintiffs specifically argue that NMFS's actions are arbitrary and capricious and not in compliance with the M-SA; that the implementation of the IBQ Program fails to comply with the M-SA; that the IBQ Program requirements are intrusive, not economically justified, and dangerous and will be ineffective and burdensome; and finally that

6

NMFS failed to properly address proposals to reopen the Charleston Bump area. At bottom, this is a case about the tension between conservation efforts aimed at a species and the commercial viability of an industry.

<u>Whether NMFS's Actions Are Arbitrary and Capricious and Not in Compliance with the M-SA</u>

<u>National Standard One</u>

Plaintiffs first challenge Amendment 7's allocation of bluefin tuna quota as in violation of National Standard One (NS1). NS1 provides that:

> (1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

16 U.S.C. § 1851(a)(1). Optimum yield is the amount of fish which

> (A) will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems; (B) is prescribed on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant social, economic, or ecological factor; and (C) in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery.

16 U.S.C. § 1802(33). Plaintiffs argue that Amendment 7 is, on its face, arbitrary and capricious because it reduces and eliminates significant landings of healthy stocks like swordfish in order to preserve allocations to other categories which are not harvesting their current quotas. Plaintiffs note that Amendment 7 fails to even address as an objective preservation of landings of other, healthy stocks, and contend that the Secretary failed to meaningfully analyze Amendment 7's impact on the PLL fleet due to political pressure.

At the outset, the Court notes that the 1999 Atlantic Tunas FMP, which outlined the bluefin tuna rebuilding program and established quota allocation carried forward in the 2006 Consolidated HMS FMP, was upheld as consistent with the Magnuson-Stevens

7

Act. *Natl. Audubon Soc. v. Evans*, CIV.A. 99-1707 (RWR), 2003 WL 23147552, at *3 (D.D.C. July 3, 2003). Here, plaintiffs have failed to demonstrate that the Secretary's reallocation of bluefin tuna quota in Amendment 7 is inconsistent with the MS-A or NS1.

"The most important limitation" on determining optimum yield is that the mechanisms proposed to achieve it "must prevent overfishing." 50 C.F.R. § 600.310(b)(2)(ii). Although the subject of a rebuilding program since 1999, bluefin tuna remains an overfished species. In 2011, NOAA declined to list bluefin tuna as an endangered species but listed it as a "species of concern." AR000634 [A47]. Plaintiffs point to no authority which would suggest that the Secretary acts arbitrarily by implementing rules designed to prevent overfishing of one species when such rules may have a collateral effect on targeting other species. On the contrary, "limits on overfished stocks [which] depress those of healthy stocks that are unavoidably caught with the endangered species" have been found to be consistent with NS1. *Massachusetts v. Pritzker*, 10 F. Supp. 3d 208, 216 (D. Mass. 2014) (citing *Lovgren v. Locke*, 701 F.3d 5, 32 (1st Cir. 2012)). Plaintiffs stress in their papers that the optimum yield of a fishery must be *more fish*, so long as catching more fish is consistent with other factors such as rebuilding or conservation. Plaintiffs' argument misses the mark – optimum yield has been consistently defined not to be synonymous with maximum yield. *See N. Carolina Fisheries Ass'n, Inc. v. Daley*, 16 F. Supp. 2d 647, 655 (E.D. Va. 1997) (discussing cases). NMFS afforded proper weight to these "other factors" when determining how best to manage and the optimum yield for the bluefin tuna fishery.

NMFS also thoroughly considered the impact of restrictions on the ability of the PLL fleet to fish for other HMS, including estimated revenue impacts of alternatives on species such as swordfish, bigeye tuna, and yellowfin tuna, *see e.g.* AR002736-002745

[A124], as well as the impacts of quota reallocation on both bluefin and other HMS. AR002551-002558 [A124]. NMFS considered but declined to adopt measures such as reducing PLL overall quota as they would result in severe economic impacts for the fleet. AR003432 [A152].

NMFS further considered estimated revenue loss to the PLL fleet based on closure of the PLL fishery during each month of the year. AR002774 [A124]. NMFS concluded that under an IBQ system, closure of the PLL fishery is less likely to occur than under a regional or group quota system. AR002775 [A124]. Additionally, Amendment 7 permits PLL vessels to land, rather than discard, some appropriately-sized bluefin tuna, thereby increasing revenue opportunities by approximately $1 million per year for this category. AR002729 [A124]. Though plaintiffs argue that NMFS consciously disregarded its own data on the economic devastation that Amendment 7 would cause, plaintiffs fail to point to or demonstrate any actual data ignored by NMFS.

Plaintiffs also contend that NMFS bowed to political pressure by other categories in adopting Amendment 7. Plaintiffs further argue that there has been no demonstration that Amendment 7 will aid in conservation, only that it frustrates the achievement of optimum yield. Plaintiffs have failed, however, to identify any evidence in the record which would support these arguments. Accordingly, plaintiffs have not demonstrated that NMFS's actions in adopting Amendment 7 fail to sufficiently maintain optimum yield or in some other way run contrary to NS1.

9

National Standard Four

Plaintiffs next contend that the Secretary has violated National Standard 4, arguing that there is no rationale for the quota allocation system as there is no apparent benefit to the Nation. NS4 provides that:

> (4) Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

16 U.S.C. § 1851(a)(4). Allocations of fishing privileges should be rationally connected to the achievement of optimum yield and the motive for making particular allocations should be justified by the goals of the FMP. 50 C.F.R. § 600.325(c)(3)(i)(A). Allocations may impose a hardship on one group if the hardship is outweighed by the total benefits received by others. *Id.* at (c)(3)(i)(B).

Plaintiffs assert that the PLL fleet should be allotted more bluefin tuna quota so that it may target and catch more swordfish, yellowfin tuna, and other HMS. Plaintiffs argue that NMFS failed to consider economic loss to the PLL fleet or the impact of Amendment 7 on communities which support the PLL fleet. Plaintiffs further argue that Amendment 7 unfairly discriminates against the PLL fleet which, since 1981, has been penalized by being banned from targeting bluefin tuna. Plaintiffs contend it is unfair that they should now lose access to plentiful species such as swordfish when it is they who have shouldered the burden of the bluefin tuna conservation effort.

Review of the record reveals that NMFS carefully considered the impacts of several alternatives on each of the seven categories as well as on the communities which support those categories when making changes in order to better account for dead discards and otherwise come

into or remain in compliance with ICCAT requirements. As defendants note, a "key concern for NMFS [in adopting Amendment 7] was implementing a longer-term solution for managing incidental [bluefin tuna] catch by pelagic longline vessels." [DE 55-1 at 13]; *see also* AR002284 [A124] (PLL catches have been significantly over their subquota in recent years); AR00547 [A41] (PLL catch of bluefin tuna increasing). Taking no action and leaving PLL quota at 8.1% with the new ICAAT requirements would result in a shutdown of the PLL fishery early in the year, which NMFS declined to do. AR003432 [A152]. Though plaintiffs would invite this Court to wade into whether an offset of 80mt of bluefin tuna for the PLL category would be fair or whether the PLL category quota was actually increased by 62.5mt, it will not second-guess NMFS' expertise in this area nor delve into the minutiae of the Secretary's decisions regarding quota allocation, as that would be "an inappropriate exercise when reviewing agency action under the APA." *Managed Pharm. Care v. Sebelius*, 716 F.3d 1235, 1251 (9th Cir. 2013).

In regard to plaintiffs' unfair burden argument, the Court would note that plaintiffs have not challenged whether the ban on PLL targeting of bluefin tuna is still appropriate. Absent any record evidence from plaintiffs that the quota reallocation was unfair or inequitable, and in light of the evidence which supports NMFS's conclusion that reallocation in the manner it chose will support conservation of bluefin tuna, the Court cannot find that the bluefin quota reallocation violates NS4.

WHETHER IMPLEMENTATION OF THE IBQ PROGRAM FAILS TO COMPLY WITH THE M-SA

Although plaintiffs challenge the IBQ Program in their opening brief under National Standard 6, in their response plaintiffs appear to challenge the IBQ Program under NS4.[3]

---

[3] Because plaintiffs have failed to respond to defendants arguments as to whether the IBQ Program violates NS6, the Court considers such argument to have been waived. *Satcher v. U. of Arkansas at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009) ("failure to oppose a basis for summary judgment constitutes waiver of that argument."). Furthermore, the Court has

11

Plaintiffs contend that if NMFS has admitted that it is the actions of a few PLL vessels causing a problem with bluefin tuna catch, AR002634 [A124], then implementing IBQ for all PLL vessels is unnecessary. In addition to addressing concerns about the actions of a few vessels, NMFS also chose to respond to the "members of the pelagic longline fleet [who] have repeatedly asked for increased individual accountability". AR003438 [A152]. Furthermore, the IBQ Program is actually intended to "reduce the likelihood that an individual vessel would be negatively impacted by the fishing behavior of another vessel, and provides flexibility for a vessel to obtain additional quota via leasing." AR002822 [A124]. Plaintiffs feel that they have been "vilified" by members of the other categories, resulting in their being disadvantaged in NMFS' rulemaking. Even if this were true, this Court "cannot overturn the Secretary's decision on the ground that some parties' interests are injured. Government regulation of an industry necessarily transfers economic rewards from some . . . to others who are favored by the regulatory scheme." *All. Against IFQs v. Brown*, 84 F.3d 343, 352 (9th Cir. 1996).

Plaintiffs next argue that the control date for the IBQ Program was not properly noticed and is arbitrary and capricious. A control date is intended "to curb speculative over-investment and overfishing—which is what the regulations are meant to restrain—during the period in which the same regulations are reviewed and developed." *P. Dawn, LLC v. Pritzker*, C13-1419 TEH, 2013 WL 6354421, at *10 (N.D. Cal. Dec. 5, 2013). Amendment 7 did not announce a

---

reviewed plaintiffs' arguments that the IBQ Program violates NS6, which provides that "[c]onservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches," and finds plaintiffs have not demonstrated they are entitled to summary judgment in their favor on this issue. 16 U.S.C. § 1851(a)(6).

control date, but rather stated that a control date will be implemented in conjunction with the effective date of the IBQ program. AR003482 [A152].

Plaintiffs' reference to a "control date" is the date that was used by NMFS to determine eligibility in the IBQ Program. The only vessel owners who were eligible for initial IBQ under Amendment 7 were those with both a valid Atlantic Tunas Longline category permit as of August 21, 2013, and with vessels determined to be "active" in that they had used pelagic longline gear on at least one reported set between 2006 and 2012. AR001781 [A82]; AR002381 [A124].

Plaintiffs argue that the eligibility date for IBQ was arbitrary, in that failure to have a valid permit as of August 21, 2013, could be mere happenstance and could arbitrarily exclude vessel owners from entitlement to IBQ. None of the named plaintiffs contend that they were denied IBQ because they lacked a valid permit on August 21, 2013. Nor do plaintiffs proffer any support that the Secretary's consideration of alternatives for determining vessel eligibility for IBQ was somehow not rational. *See* AR001768 [A82]; AR002381-82 [A124].

Rather, plaintiffs argue that the lack of notice that valid permitting as of August 21, 2013, would serve as one factor in determining eligibility runs counter to NMFS's general practice in issuing advance notice of the control date. However, the illustrative control dates relied upon by plaintiffs do not actually appear to give advanced notice that the number of participants in a fishery may be limited. *See e.g.* 79 Fed. Reg. 44737 (publication of notice on August 1, 2014, announces control date of August 1, 2014, that may be used to limit participants in summer flounder fishery); 79 Fed. Reg. 18002 (publication of notice on March 31, 2014, announces control date of March 31, 2014, that may be used to limit number of participants in skate fishery). Here, the eligibility date for participation in the IBQ program was announced on

13

August 21, 2013, the same date to be used for eligibility purposes, seemingly consistently with NMFS practices.

Plaintiffs have not demonstrated that the eligibility or control date relied upon by the Secretary in relation to the IBQ Program was arbitrary or capricious or in violation of NS4 or NS6.

National Standard Eight

Plaintiffs next argue that Amendment 7 violates National Standard 8 because "nothing in the Amendment 7 materials shows that the Agency weighed community impact based on the lack of necessary quota to achieve optimum yield on HMS stocks other than [bluefin tuna]." [DE 52-1 at 21]. NS8 provides that:

> (8) Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

16 U.S.C. § 1851(a)(8). Contrary to plaintiffs' assertion, NMFS considered the community impacts of its actions when formulating Amendment 7. NMFS specifically considered that closure of the PLL fishery due to the fleet reaching its quota would result in adverse effects to shore-based businesses, and that use of an IBQ Program would mean that closure of the PLL fishery as a whole is less likely, thereby mitigating impacts on the community. AR0002775 [A124]. In direct response to public comment, NMFS further analyzed the impact of the IBQ scheme by home port state. AR0002669-75 [A124]. NMFS specifically addressed the requirements of NS8 and Amendment 7's impact on twenty-five communities "selected for

14

having a greater than average number of HMS permits associated with them." AR0002534 [A124]; *see generally* AR002532-38 [A124].

In arguing that NMFS has violated NS8, plaintiffs place great emphasis on the thirty-five vessels which were determined not to be eligible for initial IBQ. Plaintiffs argue that NMFS has underestimated any social and economic impacts because it has ignored the loss of landings of these thirty-five vessels. NMFS recognized that some of the thirty-five vessels which did not receive initial IBQ had been damaged or destroyed or were no longer in the fishery and thus would have not have engaged in fishing even if they had received quota share. AR0002382 [A124]. As noted above, NMFS also considered alternatives when determining quota eligibility criteria. AR002748-50 [A124].

Though plaintiffs would like to see a vessel-by-vessel analysis of the impact of the IBQ Program and reallocation of bluefin tuna quota, there is no requirement that the agency undertake such an in-depth look at each harbor or the impact of the failure or success of one vessel. *See e.g. Lovgren*, 701 F.3d at 36 (argument that NS8 requires agency to analyze impact on each individual fishing community misapprehends law). NMFS also addressed this concern, and concluded that expected impacts would not be "analyzed at the level of port or state due to the nature of the bluefin fisheries, which are widely distributed and highly variable." AR002906 [A124]. Because of this variability, NMFS analyzed fishery-wide and permit-category impacts. *Id.* It is true that quota programs "can have serious adverse impacts on fishing communities." *P. Coast Fedn. of Fishermen's Associations v. Blank*, 693 F.3d 1084, 1087-88 (9th Cir. 2012). The record here supports, however, that NMFS examined the impacts of its plan on fishing communities and that it considered alternatives to the measures included in Amendment 7. *See Little Bay Lobster Co., Inc. v. Evans*, 352 F.3d 462, 470 (1st Cir. 2003) (required analysis of

alternatives and impacts is subject to a rule of reason). Plaintiffs have failed to demonstrate that any gaps in NMFS's consideration were unreasonable or that Amendment 7 violates NS8.

WHETHER THE IBQ REQUIREMENTS ARE INTRUSIVE, NOT ECONOMICALLY JUSTIFIED, AND DANGEROUS AND WHETHER THEY WILL BE INEFFECTIVE AND BURDENSOME

National Standards Seven, Nine, and Ten

Plaintiffs contend that Amendment 7 imposes significant and burdensome requirements on the PLL fleet that no other bluefin tuna category faces. Specifically, plaintiffs challenge Amendment 7's requirement that the PLL fleet use an on-board video monitoring system, in addition to existing requirements for electronic position monitoring, manual logbooks, daily electronic catch reporting and occasional mandatory observer coverage. Plaintiffs challenge the video monitoring requirement under National Standards Seven, Nine, and Ten, which provide:

> (7) Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication. (9) Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch. (10) Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea.

16 U.S.C. § 1851(a)(7);(9);(10).

*National Standard 7*

Plaintiffs argue first that requiring PLL vessels to install video monitoring equipment involves unnecessary cost and duplicates information already collected by NMFS through other measures. As plaintiffs concede, in response to public comment and to ease the burden on the PLL fleet, NMFS elected to pay for the video monitoring equipment and installation for all vessels eligible for initial IBQ shares. AR003426 [A152]. Plaintiffs contend that this fails to ease the burden on the owners of the thirty-five vessels not eligible for initial IBQ shares, but, as discussed above, a portion of those vessels would not have sought to fish in any event, and

plaintiffs fail to identify any single vessel owner who will be required to pay for his own video monitoring equipment. Additionally, that a regulation will impose cost does not mean that it violates NS7. *Connecticut v. Daley*, 53 F. Supp. 2d 147, 173 (D. Conn. 1999). NMFS also considered increased use of observers as an alternative to video monitoring, but determined that video monitoring would be a less costly measure. AR003456 [A152]. *See Nat'l. Coalition For Marine Conservation v. Evans*, 231 F. Supp. 2d 119, 133 (D.D.C. 2002) (no violation of NS7 where "NMFS considered alternatives to determine which combination of regulations would best achieve the agency's conservation goals and minimize the economic impact on fishing communities.").

Finally, though plaintiffs argue that any information gathered from video monitoring would be redundant, NMFS specifically states that the use of video monitoring will "support[] accurate catch data and bluefin tuna IBQ management measures, by providing a means to verify the accuracy of the counts and identification of bluefin reported by the vessel operator." AR003456 [A152]; *see also* AR002779 [A124] (recorded data to be used to "verify the accuracy of counts and identification of bluefin reported through VMS and logbooks"). The Secretary's conclusion that video monitoring will provide additional data which would support its bluefin tuna conservation and rebuilding goals was rational and not duplicative of other measures. *See also N. Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 94 n.8 (D.D.C. 2007) (high costs imposed by amendment to FMP accompanied by conservation gains in measures designed to stop overfishing consistent with National Standards).

*National Standards 9 &10*

Plaintiffs' challenges to Amendment 7 under NS9 and NS10 are founded on the same premise – that in order to comply with Amendment 7's video monitoring requirements vessels

17

must haul catch to be discarded on board and hold it up to "smile for the camera." Plaintiffs contend that such a requirement results in needless increase of dead discards, risk of safety to human life, and violates the agency's own regulations regarding discards and bycatch. If plaintiffs' reading of the final rule was correct, the Court would be inclined to agree. However, the Court can find no support for plaintiffs' argument in the text of Amendment 7 or its implementing regulations, nor have plaintiffs provided the Court with any basis for their argument other than mere conjecture.

Amendment 7 requires that "[a]t least one camera must be mounted to record close-up images of fish being retained on the deck at the haulback station, and at least one camera must be mounted to record activity at the waterline along the side of the vessel at the haul back station." 50 C.F.R. § 635.9(c)(1)(ii). The purpose of positioning a camera at the water line is specifically to "document animals that are caught and discarded but not brought aboard, as well as the disposition of that catch (released dead/alive)." AR003426 [A152]. Handling and retention of bluefin tuna is to be done in accordance with relevant regulations, and any vessel monitoring plan must minimize impact on current operating procedures of vessels and help ensure safety to the crew. 50 C.F.R. § 635.9(e)(2)-(3). There is no requirement that fish be hauled on board and displayed for the camera prior to being discarded.

Plaintiffs have identified no evidence which would support a determination that the video monitoring requirement fails to minimize bycatch and bycatch mortality or promote the safety of human life at sea, and thus have not demonstrated that the video monitoring requirement, or any other provision of Amendment 7, violates NS9 or NS10.

18

## WHETHER THE NMFS FAILED TO PROPERLY ADDRESS PROPOSALS TO OPEN THE CHARLESTON BUMP AREA

Plaintiffs' final challenge to Amendment 7 relates to the continued closure of the Charleston Bump area. The Charleston Bump area was closed to reduce discards of undersized swordfish, billfish, sharks, and other species. AR001235 [A77]. In their motion for summary judgment, plaintiffs argue that NMFS failed to actually address alternative measures to reduce bluefin tuna interactions and NMFS should have reopened areas to allow fisherman to avoid bluefin tuna concentrations. *See* AR001235-37 [A77] (draft EIS suggesting possibility of reopening Charleston Bump and other areas); *see also* AR005717 [F192] (insufficient scientific information to predict overlap of bluefin tuna with other HMS species except for certain times of year in limited locations).

In their response to defendants' motion, plaintiffs fail to rebut defendants' arguments regarding the decision to not reopen the Charleston Bump area, and the Court considers this issue waived. *See supra*, n.3; *Satcher v. U. of Arkansas at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009) ("failure to oppose a basis for summary judgment constitutes waiver of that argument."). The Court has further reviewed plaintiffs' argument and finds that plaintiffs have failed to show that NMFS lacked a rational basis for electing in the final rule not to reopen Charleston Bump. *See* AR003447 [A152] (strong public comment against reopening of Charleston Bump); *Daimler Trucks N.A. LLC v. E.P.A.*, 737 F.3d 95, 100 (D.C. Cir. 2013) (final rule will be deemed to be a properly logical outgrowth of proposed rule "if a new round of notice and comment would not provide commentators with their first occasion to offer new and different criticisms which the agency might find convincing.") (internal quotation and citation omitted).

In sum, plaintiffs have failed to demonstrate that the Secretary did not properly "balance competing conservation and economic interests," when adopting Amendment 7. *N. Carolina Fisheries Ass'n v. Daley*, 27 F. Supp. 2d at 654. Thorough review of the administrative record in this matter reveals that NMFS considered alternatives to the course of action it ultimately chose and responded to significant points raised during the comment period. Because defendants have demonstrated that a rational basis for them exits, the Court must find that the Secretary's actions were neither arbitrary nor capricious in adopting Amendment 7 and its implementing regulations.

## CONCLUSION

Accordingly, for the foregoing reasons, plaintiffs' motion for summary judgment [DE 52] is DENIED and defendants' motion for summary judgement [DE 55] is GRANTED. The clerk is DIRECTED to enter judgment in favor of defendants and close the file.

SO ORDERED, this _18_ day of March, 2016.

*Terrence W. Boyle*
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE